IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | | |
|---|---|---|
| CING VUNG, | ) | Case No. 4:18-cv-00209-SMR-SBJ |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | ORDER ON DEFENDANTS' |
| | ) | MOTION FOR SUMMARY |
| SWIFT PORK COMPANY and STACEY | ) | JUDGMENT |
| SANTILLAN, | ) | |
| | ) | |
| Defendants. | ) | |

This is a case about a Burmese woman with an asthmatic son who was fired less than one week after disclosing her pregnancy to her employer. Defendants filed a Motion for Summary Judgment on June 14, 2019. [ECF No. 26].[1] Viewing the record in the light most favorable to Vung as the nonmoving party, the Court is unable to conclude Defendants are entitled to judgment as a matter of law. Because dispositive issues hinge on disputed questions of material fact, Defendants' motion is DENIED.

## I.   BACKGROUND

### A.   The Parties

Vung is a Burmese immigrant who first arrived in the United States in 2013 and lives with her husband and five sons. [ECF No. 34-1 ¶¶ 1, 3]. Vung's native language is Zomi and she is fluent in Burmese; she speaks little to no English. *Id.* ¶ 7. Nevertheless, Vung is the sole breadwinner for her family. [ECF No. 26-4 at 3–4]. The parties agree Vung is a hardworking employee. [ECF No. 34-1 ¶ 3].

---

[1] Plaintiff requested a hearing on Defendants' Motion, [ECF No. 38], but the Court concludes this matter can be resolved without oral argument. *See* LR 7(c).

Swift Pork is a meat processing company that has plants across the country.  [ECF No. 26-1 ¶ 1]. Stacy Santillan (now known as Stacy Freiberg) was the Human Resource Manager at the Swift Pork facility in Marshalltown, Iowa, during the time giving rise to the events in question; she currently serves as the Director of Human Resources at the Company's office in Louisville, Kentucky.  *Id.* ¶ 2.[2]  Swift Pork employs an ethnically-diverse workforce consisting of employees from across the cultural spectrum.  The Company communicates with non-English speaking employees through the use of live interpreters and a telephonic language interpreter service when necessary.  [ECF No. 26-1 ¶ 8].

Vung started working on the line at Swift Pork's facility in Marshalltown on or about April 5, 2015.  [ECF No. 34-1 ¶ 6].  She was fired in a meeting with Freiberg on August 17, 2016.  *Id.* ¶¶ 70–71.

## B.   Company Policies

Swift Pork has a point-based attendance policy under which employees are assessed points for absences from work over the course of a rolling twelve-month period.  [ECF No. 26-1 ¶ 10]. Generally, employees receive one attendance point for every absence from work, even when they miss work because they, their child, or their spouse is sick.  *Id.* ¶ 11.  If an employee misses multiple days of work and provides doctor certification, however, only one point is assessed for the entire period of absence.  *Id.* ¶ 15; [ECF No. 26-4 at 39].  Points are assessed automatically through the Company's timekeeping software. Human resources staff manually edit an employee's attendance history for absences that do not incur points under the attendance policy, such as qualifying absences

---

[2] To avoid confusion, the Court will refer to Ms. Santillan by her current name, Stacy Freiberg.

under federal law, paid holidays and vacations, and previously-excused absences.  [ECF No. 26-1 ¶¶ 12, 26–29, 40].

The Swift Pork Employee Handbook lays out the Company's policy on FMLA leave.  It states:

> If your need for family/medical leave is foreseeable, you must give the Company at least 30 days' prior written notice.  Failure to provide such notice may be grounds for delay of leave.  In cases where the need for leave is not foreseeable, you are expected to notify the Company as soon as possible, generally within 1 to 2 business days of learning of your need for leave.  The Company has Request for Family/Medical Leave forms available from the Human Resources Department.  You must use these forms when requesting leave.

[ECF No. 26-4 at 37].  The Handbook further requires employees to submit "appropriate medical certification" supporting the qualifying reason for their need for leave within fifteen days after leave is requested.  *Id.*  Consistent with the FMLA, Swift Pork's policy allows employees to take leave to care for children with a serious health condition.  *See id.* at 42.  Proper procedure under the Company's FMLA policy calls for employees to submit a written application for FMLA leave and obtain physician certification of the reason for the absence.  [ECF No. 26-1 ¶ 33].  The parties agree Vung became eligible for FLMA on or about April 6, 2016.  *See* [ECF No. 34-1 ¶ 20].

For each day an employee will be absent, the employee is required to call in to the Company's attendance hotline number, listed on the back of every employee ID badge, at least thirty minutes prior to the start of their shift to provide identifying information and the reason for their absence.  *See* [ECF No. 26-1 ¶¶ 16, 20, 23].  An automated message played in English, Spanish, and Burmese prompts employees to leave a voicemail with their name, ID, department, and reason for not reporting to work.  *Id.* ¶ 21.  A human resources coordinator then retrieves the messages from the hotline and communicates absences to the employees' respective departments while reflecting the reason for the absence in the employee's timekeeping file.  *Id.* ¶ 22.  An interpreter is used to

retrieve and interpret messages when necessary.  *Id.*  Failure to call in is considered a "no call, no show" on the employee's attendance record and results in two points, not one; three "no call, no shows" in a rolling twelve-month period provides automatic grounds for termination.  *Id.* ¶¶ 16–17. If the employee misses multiple days, for any reason (even qualifying FMLA leave), the employee is expected to notify the Company prior the start of each shift he or she will miss.  *See id.* ¶ 33. Vung's personnel file does not indicate she was ever disciplined for failing to report an absence besides August 5, 2016 (discussed below), and Vung testified she always called in.  [ECF No. 34-1 ¶¶ 14, 39]; *see* [ECF No. 26-4 at 12–14, 20].

Employees receive a written warning when they accrue five attendance points, and a final written warning accompanied by an in-person meeting with a human resources representative after accruing eight points.  [ECF No. 26-1 ¶ 18].  The attendance policy calls for the employee's termination upon accruing the ninth attendance point.  *Id.*  When an employee reaches nine points, a human resources staff member notifies Freiberg that the employee has exceeded the allowable points so proper disciplinary or termination actions can be taken.  [ECF No. 34-1 ¶ 43].  Freiberg testified that there is no set timeframe for the termination procedure after an employee accrues nine points, but it depends on a variety of factors relating to when she is made aware the employee "pointed out" and the availability of the employee to attend the termination meeting with union representatives.  *See* [ECF No. 34-3 at 3–4, 38].  This "should be" a quick process—but it can sometimes result in an employee accruing upwards of nine points prior to termination.  *Id.*  However, human resources staff testified it would be unusual for an employee to keep their job for more than a few weeks before being terminated for pointing out.  *See* [ECF No. 34-4 at 6].

Vung disputes she was fully aware of the Company's attendance policy and the consequences for failing to adhere to it.  According to Defendants, each new employee is given a

copy of the Employee Handbook, including the Company's FMLA policy, upon hire. [ECF Nos. 26-1 ¶ 32; 26-3 at 2 ¶ 4]. Vung informs she was only provided a handbook in English, which she cannot read, and maintains that none of the Company's attendance policies are printed in any Burmese dialect—only English and Spanish. *See* [ECF No. 34-4 at 47–59]; *see also* [ECF No. 34-2 at 10] (corporate testimony stating the handbook is provided in English and Spanish, but no other languages); *cf.* [ECF No. 34-4 at 5] (testimony of human resources staff stating FMLA notices are posted only in English and Spanish). Swift Pork also states it offers training sessions on its attendance and FMLA policies in both Spanish and Burmese, [ECF No. 26-1 ¶ 9], but Vung testified that she had never received any additional training except training for initial safety procedures in Burmese, [ECF No. 26-4 at 54–56].

### C. Vung's Employment at Swift Pork

#### 1. Background

Vung's five-year-old child, A.M., has asthma that requires respiratory treatment and medications. [ECF No. 34-1 ¶ 4]. A.M.'s asthma can become aggravated by other illnesses, and when that occurs he requires special medical attention. *Id.* ¶ 5.

Sometimes A.M.'s asthma would flare up while Vung was at work, requiring her to leave for a short period of time to administer his medications. *Id.* ¶ 9. Employees are not normally allowed to leave their position in the line without permission from their supervisors, even to go to the bathroom. [ECF Nos. 34-1 ¶ 11; 34-2 at 41]. Supervisors have discretion to approve time off during the work day, however, official policy directs those requests to be approved in advance through an absence request form completed by the employee, signed by her supervisor, and turned in to human resources. [ECF No. 26-1 ¶ 13]; *see* [ECF No. 26-4 at 40]. But according to Vung, her supervisor, Leticia "Leti" Garcia, would routinely allow her and other employees to leave and return to work

without clocking in and out to attend to personal and family matters—in Vung's case, to administer asthma medication to her son.  [ECF No. 26-4 at 32–34]; *see* [ECF No. 34-1 ¶¶ 8, 10].  Garcia denies Vung ever informed her of her son's asthma and need for treatment during work hours, and states that while she would be flexible with her workers needing to leave for personal reasons, she never let employees leave without filling out proper paperwork.  *See* [ECF No. 34-2 at 29, 40].  However, Swift Pork records reflect that on at least several different occasions Vung left work—swiping out and back in through the security turnstiles, but without ever clocking out—and returned shortly thereafter, which Vung attributes to leaving to provide medical care for her son's asthma.  *See* [ECF No. 34-1 ¶¶ 12–13].  Vung did not submit absence request forms for these excursions, and was not awarded points for these instances; Defendants deny having knowledge of these mid-day truancies (though they admit the possibility of her explanation).  *See* [ECF No. 34-3 at 30–31].

## 2.  Vung's attendance history

Like many employees, Vung accrued points under the Company's attendance policy for various absences during her time at Swift Pork.  *See* [ECF No. 26-1 ¶ 36].  By January 5, 2016, her attendance file reflected she had accrued eight points.  *Id.*[3]  On January 19, Vung met with Swift Pork personnel from the human resources department, where she was given a "final written warning."  [ECF No. 26-1 ¶¶ 37–38]; *see* [ECF No. 35 at 155–56] (sealed).  The parties appear to agree Tanya Box, a human resources coordinator, was present at the meeting; they dispute whether Frieberg was also present.  This was the first attendance warning Vung had received, though under

---

[3] Vung does not appear to contest points assessed for absences occurring prior to June 2016, because she was not eligible for FMLA leave prior to that date.  She focuses her challenge to her absences on June 20, 21, and 22, 2016, which she alleges are related to her son's asthma, and August 5, 2016, related to a doctor's appointment related to her pregnancy.  These dates will be discussed more fully below.

Swift Pork policy, she ostensibly should have received an earlier warning when she arrived at five points on December 14, 2015.  [ECF Nos. 26-1 ¶ 18; 34-1 ¶¶ 46–47]; *see also* [ECF No. 26-4 at 55].

Vung accrued five points for missing work on December 14, 2015, approximately three weeks before her eighth point that triggered a final written warning and meeting on January 19, 2016.  [ECF No. 26-4 at 55].  She did not receive a written warning.

It was at this meeting, Vung asserts, that she first notified human resources staff of her son's asthma when explaining this as the reason for some of her absences.  [ECF Nos. 26-4 at 21, 28; 34-1 ¶¶ 48, 50].  Defendants dispute Vung mentioned anything about her son's asthma in this January 2016 meeting.  *See* [ECF Nos. 26-1 ¶ 39; 34-3 at 5].

Vung later missed work on March 7, 8, and 9, 2016.  [ECF No. 26-1 ¶¶ 36, 40].  Defendants submit this should have resulted in her termination under the attendance policy, *id.* ¶ 40, but instead, in a meeting with Freiberg and a union representative, Defendants excused two days of the absence and charged one as a floating holiday, *id.* ¶ 41; *accord id.* ¶ 36.  Defendants assert Vung never called in to report her absence, but her attendance file does not reflect this.  Vung maintains her points were reduced because at that meeting she informed Freiberg the absences were to provide medical treatment for her son's asthma.  *See* [ECF No. 26-4 at 18].  Defendants again deny Vung ever informed Swift Pork staff about her son's asthma.

Vung also incurred points for absences in the spring of 2016, putting her up to nine points once more.  [ECF No. 26-1 ¶¶ 36, 42–43].  Vung was charged one point for an excused absence on April 5 despite having prior approval to leave early, *see* [ECF No. 35 at 68], and despite having a similar form approved for a subsequent appointment several days later, *see* [ECF No. 26-5 at 9].  Vung was tardy and incurred one point on May 5.  [ECF No. 26-1 ¶ 44].  No disciplinary action was taken, and her attendance score subsequently fell back to seven points as two expired.  *See id.* ¶ 36.

### 3.   June 20, 21, & 22 absences

Vung was absent for three consecutive days on June 20, 21, and 22, 2016.  [ECF No. 26-1 ¶ 45].  Vung maintains she called in to the Company's call-in line to report her absence and left the following messages with the human resources department: "My son is sick" on June 20; "My son is not healthy yet" on June 22; and "My son is not getting better, so I still cannot come" on June 22.  *Id.* ¶ 46; [ECF No. 26-4 at 20–21].  Swift Pork's records do not indicate that she failed to call in.  [ECF No. 26-1 ¶ 36].  On June 23, Vung returned to work with a doctor's note that stated: "Please excuse Cing Vung from work Monday, Tuesday and Wednesday due to taking care of her ill son (6/20/16–6/22/16)."  [ECF No. 26-5 at 10].

Vung met with Freiberg and a union representative to discuss these most recent absences on June 29, 2016.  [ECF No. 26-1 ¶ 48].  Under the attendance policy, these, too, should have caused Vung to lose her job.  *Id.*  However, Vung claims she explained these June absences were again due to her need to administer breathing treatments for her son's asthma.  [ECF No. 34-1 ¶ 54]; *see* [ECF No. 26-4 at 20–21, 29].  Defendants deny Vung made any such comment, but Freiberg again reduced Vung's attendance points below the terminable level instead of firing her.  [ECF No. 26-1 ¶¶ 36, 48].  Vung was assessed only one point for the entire period of absence.  *Id.* ¶ 36.  She was not offered FMLA materials.

Nearly one month later, on July 20, 2016, Vung was sick and missed a shift.  *Id.*  ¶ 49.  She incurred one point for this absence, once again bringing her up to nine points.  *Id.*; *see also id.* ¶ 36.  She was not terminated, however, and no disciplinary action was taken against her at that time.  *See id.* ¶ 49.

### 4.   August 5 absence

Vung missed work on Friday, August 5, 2016, because she felt dizzy.  Vung went to the doctor that day and, during that appointment, learned she was pregnant.  [ECF No. 26-1 ¶ 51].  The following Monday, on August 8, 2016, Vung returned to work and turned in a note from her doctor to the human resources department, but she did not discuss its contents with human resources staff. *Id.* ¶ 53.  The note stated: "Cing Vung was last seen on August 4 [sic], 2016.  Released to regular work/activity on August 8, 2016."  *Id.* ¶ 52; *see* [ECF No. 26-5 at 11].  Vung claims she called in to report her absence as she had in the past, however, the Company's attendance software documented her as a no call, no show, and she was assessed two points.  *See* [ECF Nos. 26-1 ¶¶ 36, 50–51; 26-4 at 14, 22–23].[4]

On August 10, 2016, Vung attended another medical appointment specifically regarding her pregnancy where she received a second note granting her permission to return to work under certain restrictions, documenting that "PREGNANCY GUIDELINES" applied.  [ECF Nos. 26-1 ¶¶ 54, 55; 26-5 at 12].  Vung turned this note in to human resources the next day.  *Id.* ¶ 55.  As with her previous doctor's note, human resources staff did not discuss the pregnancy guidelines document with Vung.  [ECF No. 26-1 ¶ 55].  Vung was not offered FMLA papers.  *See* [ECF No. 34-1 ¶ 69].

### 5.   Vung's termination meeting

Freiberg terminated Vung's employment with Swift Pork in a meeting on August 17, 2016.  [ECF No. 26-1 ¶ 56].  Defendants maintain Vung was terminated for accumulating too many points under the Company's attendance policy.  [ECF No. 26-1 ¶¶ 6, 56].  A language line interpreter was present during the meeting, as was Mike Harrison, the plant superintendent, and Michael Graves, a

---

[4] The call-in records maintained by the human resources department were not retained for Vung's attendance file by Swift Pork and have been destroyed.  *See* [ECF No. 34-1 ¶¶ 32–38].

union steward.  *Id.* ¶ 57.  Vung protested her termination, challenging the points assessed against her for absences that had been due to either her pregnancy or her son's asthma.  *Id.* ¶¶ 59–60; *see also* [ECF No. 34-1 ¶ 72].  According to Vung, Freiberg dismissed Vung's claims and responded by saying: "your pregnancy is none of our business."  [ECF Nos. 26-4 at 8, 24; 34-1 ¶ 72].  Freiberg disputes she said this.  [ECF No. 34-3 at 5–6].

Several days later, on August 19, 2016, union representatives provided Vung with FMLA paperwork, which she completed.  [ECF No. 26-1 ¶ 61]; *see also* [ECF No. 35 at 127, ¶¶ 15–17].  Vung presented her case through the grievance process, but her claim was denied, and her employment with Swift Pork ended.  This lawsuit followed.

## II.  STANDARD OF REVIEW

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Paulino v. Chartis Claims, Inc.*, 774 F.3d 1161, 1163 (8th Cir. 2014).  To preclude the entry of summary judgment, the nonmovant must make a sufficient showing on every essential element of its case for which it has the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  "A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case."  *Amini v. City of Minneapolis*, 643 F.3d 1068, 1074 (8th Cir. 2011) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 252 (1986)).

"Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of the judge."  *Anderson*, 477 U.S. at 255. Even so, at the summary judgment stage, the court must view "the facts in the light most favorable to the nonmoving party and giv[e] that party the benefit of all reasonable inferences that can be

drawn from the record." *Pedersen v. Bio-Med. Applications of Minn.*, 775 F.3d 1049, 1053 (8th Cir. 2015) (quoting *Johnson v. Wells Fargo Bank, N.A.*, 744 F.3d 539, 541 (8th Cir. 2014)). "[T]he nonmoving party [need not] produce evidence in a form that would be admissible at trial in order to avoid summary judgment." *Celotex*, 477 U.S. at 324. But "[m]ere allegations, unsupported by specific facts or evidence beyond the nonmoving party's own conclusions, are insufficient to withstand a motion for summary judgment." *Menz v. New Holland N. Am., Inc.,* 507 F.3d 1107, 1110 (8th Cir. 2007).

## III. ANALYSIS

Vung alleges Defendants violated her rights under the FMLA by depriving her of leave to which she was entitled and taking adverse action against her for exercising her rights under that statute. She also alleges Defendants discriminated against her on the basis of her race and national origin, sex, and associational disability under Title VII of the Civil Rights Act and the Iowa Civil Rights Act ("ICRA"), claiming her pregnancy and son's asthma were treated differently than those of other, non-Burmese Swift Pork employees.[5] Finally, Vung alleges she was retaliated against for challenging the points assessed against her for absences due to her pregnancy appointments or taking care of her son.

Viewing the record in the light most favorable to Vung, the Court concludes disputed issues of material fact preclude summary judgment in favor of Defendants. Whether, when, and to what extent Defendants were on actual or constructive notice of Vung's pregnancy and son's serious

---

[5] As this Court has previously observed, claims brought under Title VII and the ICRA are analyzed similarly and without distinction. *Gustafson v. Genesco, Inc.*, 320 F. Supp. 3d 1032, 1043 n.4 (S.D. Iowa 2018) (Rose, J.). Thus, the Court will not distinguish between the statutes except where there are meaningful differences. *See id.*

health condition are questions that permeate each of her claims and require a jury to resolve. The Court will examine each of Vung's claims in turn.

### A.   FMLA

Vung first claims Defendants violated her rights under the FMLA in assessing attendance points and ultimately firing her for absences protected under that statute. The FMLA entitles any "eligible employee" to a total of twelve work weeks of leave during any twelve-month period to care for a "serious health condition" that renders the employee unable to perform the functions of his or her work or to care for a "serious health condition" of a spouse or child. 29 U.S.C. § 2612(a)(1)(C), (D); 29 C.F.R. § 825.112(a). A "serious health condition" is "an illness, injury, impairment, or physical or mental condition" that involves inpatient care or "continuing treatment by a health care provider." 29 U.S.C. § 2611(11); 29 C.F.R. § 825.113(a). On this front, the Act permits an employee to take leave intermittently to care for chronic conditions, such as asthma, that occur over an extended period of time, require periodic treatment, or cause episodic periods of incapacity. *See* 29 U.S.C. § 2612(b)(1); 29 C.F.R. § 825.115(c). The Act also provides for leave related to the employee's pregnancy and prenatal care. 29 U.S.C. § 2612(a)(1)(A); 29 C.F.R. § 825.120(a)(4).

The FMLA also protects workers who exercise their rights under the statute. It is unlawful "for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under [the FMLA]." 29 U.S.C. § 2615(a)(1). The United States Court of Appeals for the Eighth Circuit recognizes three distinct types of claims brought under the FMLA: "entitlement" or "interference" claims; "retaliation" claims; and "discrimination" claims. *Brown v. City of Jacksonville*, 711 F.3d 883, 890–91 (8th Cir. 2013). The parties agree Vung brings an interference claim and a discrimination claim, both of which arise under § 2615(a)(1). *Id.*; *see* [ECF

-12-

Nos. 27-1 at 4; 33-1 at 13].   An employee may bring an interference claim when her employer "refuses to authorize leave under the FMLA or takes other action to avoid responsibilities under the Act"; when her employer "takes adverse action against [the] employee because the employee exercises rights to which [s]he is entitled under the FMLA," she can sue for discrimination. *Pulczinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1005–06 (8th Cir. 2012).

At the heart of Vung's FMLA claims is the issue of notice.   "Because adequacy of notice is a fact-rich question, it is perhaps best resolved by the trier of fact, particularly, where, as is the case here, the employer and employee dispute the quantity and nature of communications regarding the employee's [condition]."   *Burnett v. LFW Inc.*, 472 F.3d 471, 479 n.4 (7th Cir. 2006); *accord Clinkscale v. St. Therese of New Hope*, 701 F.3d 825, 827 (8th Cir. 2012)   ("Whether an employee gave sufficient information to put his or her employer on notice that an absence may be covered by the FMLA is a question of fact for the jury.").   As will become evident, the parties in this case fundamentally disagree on the nature, extent, and timing of Vung's communications with Swift Pork staff concerning her FMLA-qualifying conditions.   Even though some of these communications pre-date Vung's FMLA eligibility, they nevertheless color subsequent interactions between her and her employer, generating factual issues that preclude summary judgment on both of Vung's FMLA claims.

### 1.   FMLA interference

To prevail on her FMLA interference claim, Vung must demonstrate she was "an eligible employee and that she gave adequate notice to [Defendants] of her need for FMLA leave."   *Wages v. Stuart Mgmt. Corp.*, 798 F. 3d 675, 679 (8th Cir. 2015).   An interference claim has three elements Vung must prove: (1) "she was eligible for FMLA leave"; (2) Defendants were "on notice of her need for FMLA leave"; and (3) Defendants "denied her benefits to which she was entitled" under

the Act. *Hasenwinkel v. Mosaic*, 809 F.3d 427, 432 (8th Cir. 2015). The parties agree Vung became an "eligible employee" on April 6, 2016, one year after she started with Swift Pork, and was not entitled to FMLA benefits prior to that date. [ECF No. 26-1 ¶ 35]; *see* 29 U.S.C. § 2611(2)(A) (defining an "eligible employee" under the FMLA as one who has been employed for at least twelve months by the employer from whom she seeks leave and has worked at least 1,250 hours the past twelve-month period). Defendants contend they are entitled to judgment as a matter of law, however, because she did not provide the Company with adequate notice of her need for FMLA leave. Rather, they assert Vung was not entitled to FMLA benefits because she was fired for "pointing out" under the Company's attendance policy.

"A claim under the FMLA cannot succeed unless the plaintiff can show that [she] gave [her] employer adequate and timely notice of [her] need for leave . . . ." *Chappell v. Bilco Co.*, 675 F.3d 1110, 1116 (8th Cir. 2012) (citation omitted). In order to fulfill this duty to notify, an employee must provide enough information for her employer to determine whether the FMLA may apply to the request to be excused from work. *Id.*; *see* 29 C.F.R. §§ 825.302(c), .303(b). Such information may include, but is not limited to:

> information . . . that a condition renders the employee unable to perform the functions of the job; that the employee is pregnant or has been hospitalized overnight; whether the employee or the employee's family member is under the continuing care of a health care provider; . . . or if the leave is for a family member that the condition renders the family member unable to perform daily activities . . . ; and the anticipated duration of the absence, if known.

*Id.* §§ 825.302(c); .303(b). Simply calling in "sick" is insufficient, but the employee need not specifically mention the FMLA when seeking leave. *Id.* §§ 825.302(c); .303(b). Whether the need for FMLA leave is foreseeable or unforeseeable, an employee is required to notify her employer "as soon as practicable," and the adequacy of the notice's timing depends on the "facts and

-14-

circumstances in the individual case." *Id.* § 825.302(b); .303(a).[6]  A n employee must only provide

notice of the qualifying condition once.  *See* 29 C.F.R. § 825.302(a).  Only after the employee has

placed her employer on notice of her qualifying condition does the employer have the duty to inquire

further to obtain additional information about whether the employee needs or seeks FMLA leave.

*Spangler v. Fed. Home Loan Bank of Des Moines*, 278 F.3d 847, 853 (8th Cir. 2002).  But in all

cases, "it must be clear that the employee had actual notice of the FMLA notice requirements."  29

C.F.R. § 825.304(a).  Indeed, an employer has the obligation to apprise its employees of their rights

under the FMLA—failure to do so can itself amount to "interference with, restraint, or denial of the

exercise of an employee's FMLA rights."  *Id.* § 825.300(a), (d), (e).

As a preliminary matter, Vung claims she was not adequately apprised of her rights under

the FMLA because the Company's policies are provided only in English and Spanish, not Burmese,

and she was never given training specifically concerning FMLA benefits.[7]  More fundamentally,

---

[6] The parties do not discuss whether Vung's need for intermittent leave to care for A.M.'s asthma was foreseeable or unforeseeable, but both cite to 29 C.F.R. § 825.302(c), governing notice requirements for "foreseeable FMLA leave."  *See* [ECF Nos. 27-1 at 5; 33–1 at 17, 24].  Though the evidence suggests Vung knew about her son's condition at least as early as January 2016, she could not have known on what days his condition would require her to miss work to administer his asthma medications.  In other words, her need for leave does not appear to have been for a "planned medical treatment."  29 C.F.R. § 825.302(a).  Regardless, the regulations sufficiently mirror each other insofar as it concerns an employee's duty to provide her employer with notice, and neither party has advanced arguments specific to one regulation.

[7] Swift Pork acknowledges it provides its employee handbook in only English and Spanish. [ECF No. 34-2 at 10]; *see* 29 C.F.R. § 825.300(a)(4) ("Where an employer's workforce is comprised of a significant portion of workers who are not literate in English, the employer shall provide the general notice in a language in which the employees are literate.").  While it is the Company's stated practice to go through the details of the employee handbook with an interpreter, Vung states she was not given any training after her initial orientation concerning safety procedures.  [ECF No. 26-4 at 54–56].  Defendants assert as a matter of fact that the Company's attendance and FMLA policies were provided to Vung in Burmese upon hiring her and communicated to her during orientation and annual training through a Burmese interpreter, *see* [ECF No. 26-1 ¶ 9], but in the same breath report no specific knowledge of Vung as one of hundreds of employees working at Swift Pork, even by her own supervisor, *see* [ECF No. 34-2 at 26].

however, the parties dispute key facts surrounding Vung's communications with human resources personnel and whether they were sufficient to put Defendants on notice of her qualifying conditions to trigger their duty to inquire further into her need for FMLA leave.  Vung contests two series of absences occurring after the date of her FMLA eligibility that she claims should have been covered by the Act: (1) her absences on June 20, 21, and 22, 2016, to provide medical treatment for her asthmatic son; and (2) her August 5, 2016 absence where Vung discovered she was pregnant.  The circumstances surrounding both instances present disputed questions of fact the preclude summary judgment in favor of Defendants.

*First*, conflicting testimony in the record presents an issue of disputed fact regarding whether Vung sufficiently placed Defendants on notice of her son's chronic health condition and her need to leave work during the day to administer his medical treatments.  Vung testified she first informed Swift Pork human resources staff present at the January 19, 2016 meeting—the first meeting regarding her attendance points—that some of her prior absences had been due to her son's asthma. [ECF No. 34-1 ¶¶ 40, 50]; *see* [ECF No. 26-4 at 21, 28].  Though this meeting pre-dates Vung's eligibility for FMLA benefits, the interaction is significant because it presents facts that, if true, could lead a reasonable jury to conclude Defendants were on notice of her son's asthma as early as January 2016.  Defendants dispute this aspect of the conversation took place, requiring a credibility determination that cannot be made by the Court and a question of fact that can only be resolved by a jury.

The contents of Vung's communications in the January 5, 2016 meeting colors Vung's subsequent interactions with Swift Pork's human resources department.  Defendants point out the medical note concerning Vung's absences on June 20, 21, and 22 only reference her son's treatment for a virus, *see* [ECF No. 26-5 at 6, 10], but a reasonable jury could conclude that documentation,

along with phone calls informing "My son is sick," "My son is not healthy yet," and "My son is not getting better, so I still cannot come," should have sufficiently notified Defendants of Vung's need for FMLA leave to trigger their duty to inquire further into the circumstances of her absences in light of her prior interactions with human resources staff.  Defendants admit there are no "magic words" that an employee is required to say to notify employers of her need for FMLA leave, and the mention of a child with asthma is a condition all agree is sufficient; indeed, according to one human resources professional at Swift Pork, an employee stating "my child has an illness and I'm going to be missing work" is enough to trigger the Company's duty to inquire further.  [ECF Nos. 34-1 ¶¶ 19, 51; 34-2 at 11–12, 40; 34-3 at 10, 20; 34-4 at 6].

Even more apposite is Vung's testimony that she explained to Freiberg in their June 29, 2016 meeting that her absences on June 20, 21, and 22 were due to the need to care for her son's asthma. *See* [ECF No. 26-4 at 29]. Defendants again deny Vung's side of the story, but Vung was assessed only one point for the entire period of her absence, reflecting an excused absence under Company policy, and Freiberg again reduced Vung's attendance points below the terminable level instead of firing her.  *See* [ECF No. 26-1 ¶ 36].  Viewed in the light most favorable to Vung, the series of events generates a reasonable inference that a jury could believe Vung at least informed Freiberg of her son's condition in this meeting.  And considering the disputed nature of her prior interactions with Swift Pork human resources staff, described above, a reasonable jury could even conclude Freiberg and her human resources team should have been on notice of Vung's situation well prior to this date and inquired further into her need for FMLA leave to cover these absences.

Moreover, the evidence, viewed in the light most favorable to Vung, supports a reasonable inference she also notified her direct supervisor of her need to leave work to administer treatment for her son's asthma.  Garcia acknowledged that, consistent with her previous human resources

experience, an employee bringing a child's asthma to her attention should cause her to direct the employee to human resources.  [ECF No. 34-2 at 40].  But according to Vung, Garcia would routinely allow the workers she supervised to periodically leave work for personal matters.  [ECF No. 26-4 at 32–33].  Instead of informing Vung of her FMLA rights or referring her to human resources, Vung testified Garcia allowed her to informally leave work specifically to administer asthma medication to her son when his condition required attention without turning in the requisite paperwork through the proper channels.  *Id.*  Garcia disputes she allowed employees to skirt the Company's formal policies, of course; but the evidence shows that, at least on several occasions, Vung did in fact leave work in the middle of her shift for a short amount of time without clocking out and without incurring any attendance points, consistent with her description of how Garcia was "flexible" with the workers under her supervision.  [ECF No. 34-1 ¶ 12].  Significantly, "[a]n employer's action that deters an employee from participating in protected activities constitutes 'interference' or 'restraint' of the employee's exercise of his rights."  *Phillips v. Mathews*, 547 F.3d 905, 910 (8th Cir. 2008) (quoting *Stallings v. Hussmann Corp.*, 447 F.3d 1041, 1050 (8th Cir. 2006)).  And Garcia's benevolent purpose does not matter—"[a]n employee can prove interference with an FMLA right regardless of the employer's intent."  *Stallings*, 447 F.3d at 1050.  "Although '[a]n employer may also require an employee to comply with the employer's usual and customary notice and procedural requirements for requesting leave,' 'failure to follow such internal employer procedures will not permit an employer to disallow or delay an employee's taking FMLA leave if the employee gives timely verbal or other notice.'"  *Spangler*, 278 F.3d at 852 (alteration in original) (quoting 29 C.F.R. § 825.302(d)).  In the end, the record demonstrates that a reasonable jury could find this unofficial custom described by Vung occurred and dissuaded her from formally seeking FMLA leave through the proper channels in accordance with Swift Pork's official policies.  *See*

29 C.F.R. § 825.220(b) ("Interfering with the exercise of an employee's rights would include, for example, not only refusing to authorize FMLA leave, but discouraging an employee from using such leave.").

*Second*, there is a disputed issue of fact regarding whether Vung sufficiently put Defendants on notice of her pregnancy.  Vung first found out about her pregnancy on August 5, 2016.  It is undisputed the doctor's note from Vung's follow-up appointment referenced her pregnancy, even if the note excusing her original absence for medical treatment did not.  [ECF No. 26-1 ¶ 55].  The note's receipt by human resources staff is evidenced by the marking at the top of the document. [ECF No. 26-5 at 12]; *see* [ECF No. 34-4 at 4] (explaining human resources staff acknowledge employee documentation for absences by initialing or writing the identification number at the top of the page).  And Swift Pork staff agree this would ordinarily be sufficient to place the Company on notice.  [ECF Nos. 34-3 at 7; 34-4 at 4–5].  A reasonable jury could conclude that a note from a doctor's office with the all-caps language "PREGNANCY GUIDELINES" gave Defendants sufficient notice of Vung's FMLA-qualifying condition.  *Wages*, 798 F.3d at 680 (rejecting employer's argument that doctor's note was insufficient to give notice of pregnancy);  *see also Phillips*, 547 F.3d at 910 ("FMLA leave 'include[s] visits to a doctor when the employee has symptoms that are eventually diagnosed as constituting a serious health condition, even if, at the time of the initial medical appointments, the illness has not yet been diagnosed nor its degree of seriousness determined.'" (alteration in original) (citation omitted)).

Defendants contend these factual disputes matter little, that Vung's claim fails as a matter of law, because she was actually fired for "pointing out" under Swift Pork's attendance policy and thus not entitled to any FMLA benefits.  It is true that "an employer who interferes with an employee's FMLA rights will not be liable if the employer can prove it would have made the same decision had

the employee not exercised the employee's FMLA rights." *Bacon v. Hennepin Cty. Med. Ctr.*, 550 F.3d 711, 715 (8th Cir. 2008) (citation omitted).  But Defendants' position presumes they would have made the same decision to fire Vung, contrary to their own evidence.  Twice before Vung accrued a terminable level of points; twice Freiberg chose not to fire her.[8]  Given Defendants' practice of reducing Vung's points and allowing her to keep her job—and viewing this history in the light most favorable to Vung—Defendants cannot demonstrably prove, at the summary judgment stage, they would have made the same decision to fire her.  *See Clinkscale*, 701 F.3d at 828 (rejecting employer's argument "that [the worker] was no longer an eligible employee when she put [the employer] on notice of her health condition" and finding dispute of material fact precluding summary judgment).

Defendants' next argument—that Vung failed to comply with Company call-in procedure, negating any protection for her August 5 absence—similarly ignores glaring factual issues.  Vung testified she called in to report her absence, and has consistently maintained this position.  At first blush, this appears to contradict Vung's attendance record recording her as a "no call, no show" that day.  But testimony from Swift Pork's human resources personnel reflects it is not uncommon for an employee to have to contest points for excused absences that staff failed to correct.  [ECF No. 34-1 at 8].  And it appears Vung had been incorrectly assessed points for a previously-excused absences on another occasion.  *Compare* [ECF No. 26-4 at 55] (assessing a half-point on April 5,

---

[8] Moreover, Defendants' argument misconstrues Vung's point tally when the record is viewed in her favor.  Vung would have had accrued nine or more points when disregarding *any one* of the occurrences at issue, viewed in isolation.  But because the Court has concluded factual issues preclude judgment as a matter of law on *both* occurrences, it is possible that a reasonable jury could find the points incurred for Vung's June 20, 21, and 22 and August 5 absences were protected under the FMLA.  In such case, Vung would only have accrued eight points at the time of her termination meeting—less if excluding the April 5 half-point wrongfully assessed for an excused absence.

2016) *with* [ECF No. 35 at 68] (excusing early out for pre-approved appointment).  On this front, too, Defendants' arguments to the contrary essentially ask the Court to discredit Vung's testimony and weigh the evidence in their favor—something that is not permitted at the summary judgment stage and expressly reserved for the trier of fact at trial.[9]

## 2.  FMLA discrimination

FMLA discrimination claims are analyzed under the *McDonnell–Douglas*[10] burden-shifting framework.  "To establish a *prima facie* case of FMLA discrimination, [Vung] must show: (1) that [s]he engaged in activity protected under the Act, (2) that [s]he suffered a materially adverse employment action, and (3) that a causal connection existed between the employee's action and the adverse employment action." *Hudson v. Tyson Fresh Meats, Inc.*, 787 F.3d 861, 866 (8th Cir. 2015) (citation omitted).  Discrimination claims, like retaliation claims, "require proof of the employer's discriminatory intent." *Brown*, 711 F.3d at 891; *see Pulczinski*, 691 F.3d at 1006 ("An employee making [an FLMA discrimination] claim must prove that the employer was motivated by the employee's exercise of rights under the FMLA.").  At a minimum, Vung must point to evidence

---

[9] The proper inquiry on summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251–52.  But evidence is not so "one-sided" merely because it aids that party's case. *See Argenyi v. Creighton Univ.*, 703 F.3d 441, 446 (8th Cir. 2013) (citing *C.R. Pittman Constr. Co., Inc. v. Nat'l Fire Ins. Co. of Hartford*, 453 F. App'x 439, 443 (5th Cir. 2011)); *see also Harris v. J.B. Robinson Jewelers*, 627 F.3d 235, 239 (6th Cir. 2010) ("A court may not disregard [deposition] evidence merely because it serves the interests of the party introducing it."); *Berry v. Chi. Transit Auth.,* 618 F.3d 688, 691 (7th Cir. 2010) ("[W]e long ago buried—or at least tried to bury—the misconception that uncorroborated testimony from the non-movant cannot prevent summary judgment because it is 'self-serving.' If based on personal knowledge or firsthand experience, such testimony can be evidence of disputed material facts." (citation omitted)).  This case is not so one-sided. *Cf. Sanchez-Estrada v. MAPFRE Praico Ins. Co.*, 126 F. Supp. 3d 220, 224, 228 n.4 (D.P.R. 2015) (rejecting the plaintiff's "sham affidavit" contradicting her own deposition testimony).  Vung's testimony at least presents a triable issue of fact that will require a jury to decide whether it believes her assertions.

[10] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

creating an inference that her exercise of FMLA rights "played a part" in Defendants' decision to fire her. *Pulczinski*, 691 F.3d at 1007 (citing 29 C.F.R. § 825.220(c), which adopts a "negative factor" standard and prohibits FMLA leave from being counted under no fault attendance policies). If Vung can establish a *prima facie* case, the burden shifts to her employer to articulate a legitimate, nondiscriminatory reason for terminating her. *Hudson*, 787 F.3d at 866. "The employee may then demonstrate that the proffered reason is pretextual, showing that 'the employer's proffered explanation is unworthy of credence' or 'persuading the court that a prohibited reason more likely motivated the employer.'" *Id.* (quoting *Stallings*, 447 F.3d at 1052). Vung does not advance direct evidence of FMLA discrimination, so her claim must be analyzed under the burden-shifting framework.

Vung has successfully demonstrated a *prima facie* case of FMLA discrimination. The crux of Vung's position is that she sought to be excused from work to administer asthma treatments to her son and consult medical professionals for what she discovered to be her pregnancy, both FMLA-protected events. It is undisputed she incurred attendance points for these absences and was subsequently fired. *See* 29 C.F.R. § 825.220(c) (prohibiting employers "from discriminating or retaliating against an employee . . . for having exercised or attempted to exercise FMLA rights"). Viewed in the light most favorable to Vung, the record supports a reasonable inference that a causal relationship between Vung's attempts to secure excused absences for FMLA-qualifying events and the points associated with her June 20–22 and August 5 absences, given their temporal proximity to her termination. Though the "mere coincidence of timing," alone, does not often establish causation, this is not a case of a "one-month" or "two-month lag" that is too long to generate such an inference. *See Ebersole v. Novo Nordisk, Inc.*, 758 F.3d 917, 925 (8th Cir. 2014); *Hanson v. Mental Health Res., Inc.*, 948 F. Supp. 2d 1034, 1045 (D. Minn. 2013) (finding seven-week gap between protected

activity and termination).  Vung was terminated on August 17—mere days after turning in a note to human resources indicating she was pregnant (and in need of FMLA leave).  *See Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 833 (8th Cir. 2002), *abrogated on other grounds by Torgerson v. City of Rochester*, 643 F.3d 1031 (8th Cir. 2011) (en banc) (holding two-week gap between leave and termination was "sufficient, but barely so, to establish causation"); *cf. Hite v. Vermeer Mfg. Co.*, 446 F.3d 858, 866 (8th Cir. 2006) (holding longer two-month gap between leave and termination established an inference of causation when supported by additional evidence of discriminatory intent).  Defendants' observation that she had twice "pointed out" and was twice "saved" buttresses the inference of discrimination: the variable is Vung's disclosure of her pregnancy.

Defendants' refrain that they lacked notice of Vung's need for FMLA leave does not undermine her *prima facie* case, but it does proffer a legitimate and non-discriminatory reason for assessing points for these absences and firing her.  Vung does not advance evidence of explicit discriminatory animus, however, she has borne her burden of demonstrating pretext by generating disputed issues of material fact as to whether Defendants' explanation "is unworthy of credence." *Hudson*, 787 F.3d at 867 (quoting *Stallings*, 447 F.3d at 1052).  As in *Hudson*, Vung has presented enough evidence to raise a genuine question as to whether her communications with human resources personnel was sufficient to place Defendants on notice of her FMLA-qualifying conditions and need to take leave under the Act when coupled with the fact that Defendants did not consistently enforce their point-based attendance policy, rendering their notice defense pretextual.

*Pulczinski* does not aid Defendants' pretext argument.  There, the Eighth Circuit rejected an employee's ADA and FMLA discrimination claims because the worker failed to rebut the employer's position that it truly believed the employee violated company rules by discouraging overtime work.  691 F.3d at 1003, 1007 (holding "proof that the employee never violated company

rules does not show that the employer's explanation was false," only "that the employer's belief was mistaken").  But unlike in this case, the truth or falsity of the *Pulczinski* employer's explanation for firing the plaintiff (its belief that the plaintiff discouraged others from overtime work) did not bear on whether it could have truly believed that reason in firing him (thus failing to show pretext for alternative, discriminatory motives).  The disputed facts in that case did not preclude summary judgment because they did not speak to the relevant inquiry—whether the employer's explanation was false.  Because a reasonable jury in this case could find Swift Pork had sufficient notice of Vung's need for FMLA leave, these disputed facts go straight to truth or falsity of Defendants' explanation for firing Vung—whether Defendants actually believed that she had accrued a terminable amount of attendance points that were not protected by federal law.  *Cf. Stallings*, 447 F.3d at 1052–53 (denying summary judgment on FMLA discrimination claim because disputed facts related to employee's communications about his leave could lead a jury to believe the employer's stated reason, that the employee was lying, was pretextual).  In other words, here, and unlike in *Pulczinski*, the disputed facts surrounding Defendants' notice of Vung's FMLA-qualification go directly to "the key question" of "whether the defendant believed [the stated basis for termination] to have occurred."  *See* [ECF No. 27-1 at 18] (quoting *Macias Soto v. Core-Mark Int'l, Inc.*, 521 F.3d 837, 842 (8th Cir. 2008)).  Amid these factual disputes, the Court cannot conclude that, as a matter of law, Defendants did not discriminate against Vung on the basis of her FMLA rights.

### B.  Race, Sex, and Disability Discrimination

Vung also claims Defendants discriminated against her on the basis of characteristics protected under state and federal anti-discrimination laws.[11]  Vung characterizes her claims as a confluence of discriminatory conduct as opposed to discrimination based on any one discrete protected class.  In essence, she claims that, as a Burmese woman, Swift Pork treated her pregnancy and need to care for her asthmatic son differently than those of non-Burmese employees.  *See Chambers v. Omaha Girls Club*, 629 F. Supp. 925, 944 n.34 (D. Neb. 1986), *aff'd sub nom. Chambers v. Omaha Girls Club, Inc.*, 834 F.2d 697 (8th Cir. 1987) (adopting a "sex plus" theory of discrimination); *see also Lam v. Univ. of Hawai'i*, 40 F.3d 1551, 1562 (9th Cir. 1994) ("Rather than aiding the decisional process, the attempt to bisect a person's identity at the intersection of race and gender often distorts or ignores the particular nature of their experiences.").  The parties appear to agree Vung's discrimination claims boil down to a race and national origin-sex discrimination claim and a race and national origin-associational disability discrimination claim, and the Court will treat them as such.  *See* [ECF Nos. 27-1 at 19, 21; 33-1 at 28, 31].

---

[11] Vung brings her claim of race and national origin discrimination under Title VII of the Civil Rights Act and the Iowa Civil Rights Act ("ICRA"), and her sex (pregnancy) and associational discrimination claims solely under the ICRA.  Unlike the Americans with Disabilities Act ("ADA"), which prohibits discrimination against a qualified individual "because of the known disability of an individual with whom the qualified individual is known to have a relationship or association," 42 U.S.C. § 12112(b)(4), the ICRA contains no such express provision, *see* Iowa Code § 216.6(1)(a) (prohibiting discrimination "against any applicant for employment or any employee" because of protected characteristics "of such applicant or employee").  The Iowa Supreme Court has not considered whether such a claim extends under the ICRA, only having rejected the applicability of an "associative discrimination" theory to the facts of a particular case.  *See Monson v. Iowa Civil Rights Comm'n*, 467 N.W.2d 230, 233 (Iowa 1991) ("[Plaintiff] was not terminated because of his association with a disabled person. He was terminated because of extended absence from work.").  Defendants commit one lone sentence to this point, and the Court declines to speculate on a matter of statutory interpretation without serious argument by the parties.

The ICRA prohibits employers from discharging or otherwise discriminating in employment on the basis of, among other protected traits, race, sex, national origin, and disability.  Iowa Code § 216.6(1)(a).   Similarly,  Title VII prohibits employers from discharging or otherwise discriminating against any employee "because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  To prevail under either state and federal law, Vung must show her termination was motivated by Defendants' discriminatory intent.  42 U.S.C. § 2000e-2(m) ("[A]n unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice."); *see also Pippen v. State*, 854 N.W.2d 1, 9 (Iowa 2014) ("In a disparate treatment case [under the ICRA], the plaintiff bears the burden of showing he or she has been harmed by discriminatory animus of the employer.").

Absent direct evidence, Vung must prove her discrimination claims under the familiar *McDonnell Douglas* framework.  To establish a *prima facie* case for discrimination, Vung bears the burden of demonstrating: "(1) she was a member of the protected group; (2) she was qualified to perform the job; (3) she suffered an adverse employment action; and (4) the circumstances permit an inference of discrimination."  *Bearden v. Int'l Paper Co.*, 529 F.3d 828, 831 (8th Cir. 2008). Evidence of pretext can be used to demonstrate a *prima facie* case.  *Young v. Builders Steel Co.*, 754 F.3d 573, 577 (8th Cir. 2014) ("Although evidence of pretext is normally considered at the last step of the *McDonnell Douglas* analysis, pretext can also satisfy the inference-of-discrimination element of the prima-facie case.").   Among other ways, a plaintiff may show pretext by demonstrating her employer "(1) failed to follow its own policies, (2) treated similarly-situated employees in a disparate manner, or (3) shifted its explanation of the employment decision."  *Lake v. Yellow Transp., Inc.*, 596 F.3d 871, 874 (8th Cir. 2010).  "A prima facie case creates a rebuttable

presumption of discrimination," shifting the burden to Defendants to provide a legitimate, nondiscriminatory reason for the adverse action taken against Vung. *Id.* at 873. If Defendants can articulate a nondiscriminatory reason, "the presumption disappears" and the burden swings back to Vung, requiring her to demonstrate her employer's proffered reason is pretextual. *Id.* at 873–74 (citation omitted).

There is no question Vung is a member of several protected groups and suffered adverse employment actions. Defendants contend Vung cannot prove the second element of her *prima facie* case because she had pointed out under the Swift Pork attendance policy and thus was not "qualified" for the job, but the Court rejects that argument for the same reasons discussed above. Vung is not required to disprove her employer's reason for terminating her at the *prima facie* stage. *See Lake*, 596 F.3d at 873–74. Moreover, Defendants' failure to consistently enforce the attendance policy undermines their assertion that she would have been fired anyway and thus does not, as a matter of law, show she was not qualified for the job.

Ultimately, the fighting issue here is whether the circumstances permit an inference of discrimination. The Court concludes Vung has managed to demonstrate a *prima facie* case of discrimination, and that the same disputed issues of fact that preclude judgment as a matter of law on Vung's FMLA claims likewise preclude summary judgment on her discrimination claims.

### 1. *Prima facia* case

Vung first contends Freiberg's alleged comment during her termination meeting that her pregnancy was "none of our business" constitutes direct evidence of discrimination. This is not direct evidence of discrimination. "Direct evidence" is "evidence showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment

action." *Holmes v. Trinity Health*, 729 F.3d 817, 821 (8th Cir. 2013) (citation omitted).  It does not include "statements by decisionmakers that are facially and contextually neutral."  *Aulick v. Skybridge Ams., Inc.*, 860 F.3d 613, 620 (8th Cir. 2017) (citation omitted).  At best, Freiberg's alleged statement reflects a callous disregard for the circumstances of Vung's pregnancy.  Here, Vung has not pointed to evidence that "clearly points to the presence of an illegal motive." *Torgerson*, 643 F.3d at 1044.

Turning to indirect evidence of discrimination, the Court rejects Vung's argument that she was discriminated against because she was not given a baby shower while other employees were. The undisputed evidence clearly shows these events were not put on by Defendants, but by groups of employees themselves, for one another, and not by any member of the Swift Pork management. *See* [ECF Nos. 34-2 at 39 ; 34-4 at 3].  That Vung was not a part of this group of workers who threw such parties for one another does not impute invidious race discrimination onto her employer.

However, Vung has advanced just enough evidence to show an inference of discrimination and fulfill her burden of demonstrating a *prima facie* case—at least to survive summary judgment. Vung had reached a terminable level of points, twice, and was not fired; most recently, she had accrued nine points nearly one month prior to her termination, in July 2016.  Yet she was fired a matter of days after turning in a note that, viewed in the light most favorable to Vung, disclosed her pregnancy to Swift Pork's human resources department.  The timing of Vung's termination, less than one week after turning in her doctor's note, supports an inference of discrimination when considered in the context of her employment history.  *See Sprenger v. Fed. Home Loan Bank of Des Moines*, 253 F.3d 1106, 1113–14 (8th Cir. 2001) (noting that a "matter of weeks" between a protected activity and an adverse employment action was sufficient to complete a prima facie case of discrimination); *cf. Foster v. Time Warner Entm't Co., L.P.*, 250 F.3d 1189, 1195–96 (8th Cir.

2001) (finding temporal connection sufficient to demonstrate *prima facie* case of retaliation under the circumstances of an "ongoing struggle" between employer and employee).

Vung also points to several other non-Burmese women identified by employees at Swift Pork who were not fired but granted leave after disclosing their pregnancies.[12]  *See* [ECF Nos. 34-2 at 39; 34-4 at 3]; *see also* [ECF No. 35 at 58, 67] (listing approved employee leave for pregnancy). Defendants' contention that Vung has not shown she is similarly situated to these women ignores the inference of discrimination based on the temporal proximity between Vung's termination and disclosure of her pregnancy and misconstrues the "relevant respect[]" in which to compare her.  *See Bone v. G4S Youth Servs., LLC*, 686 F.3d 948, 956 (8th Cir. 2012).  It is at the human resources level that Vung alleges she was discriminated against, not at the supervisory level—any variation between the employees' supervisor or position is immaterial because each employee working on the Swift Pork line is in a comparable position to Vung with respect to their rights and expectations of obtaining qualified leave under Swift Pork policies and applicable law.  Defendants' attempt to place the Court's attention on the lack of disciplinary history of these employees is also a red herring. Considering Defendants' inconsistent application of its attendance policy, Defendants cannot definitively establish that any variation in points at the time pregnancy leave was requested is material.

Neither can the Court conclude, as a matter of law, that Vung has failed to establish a *prima facie* case of discrimination on the basis of her associational disability as a Burmese woman. Vung has again identified several non-Burmese employees who received approved leave to care for their child's serious health condition, while she was assessed attendance points for similar conduct.

---

[12] Garcia states a Burmese employee, Lahpaw, currently works at Swift Pork and was granted leave for her pregnancy in 2016.  *See* [ECF No. 34-2 at 39–40].  Defendants' records do not indicate this individual as an employee granted leave.  *See* [ECF No. 35 at 58–67].

*See* [ECF Nos. 34-2 at 41; 35 at 60, 62, 64, 66].  This is sufficient, at least for Vung to withstand summary judgment.  Defendants objections on this point are identical to those made above and are similarly rejected.

## 2.   Pretext

Defendants contend they did not know of Vung's pregnancy or her son's asthma prior to her termination and again provide their belief that she had previously accrued a terminable level of attendance points as a legitimate, nondiscriminatory reason to justify her firing.  But the disputed facts surrounding Vung's communications with Swift Pork personnel—and whether the information conveyed was sufficient to place Defendants on notice of her protected conditions—also prelude judgment as a matter of law on her discrimination claims.  If a jury believes Vung communicated sufficient information to place Defendants on notice of her pregnancy and need to administer medical treatment for her son's asthma, it is conceivable, at least, that it could also find Defendants' explanation for Vung's termination amounts to pretext for discrimination.  As it stands, the issue remains an open question that cannot be resolved at the summary judgment stage.

In sum, the Court is unable to conclude, as a matter of law, that Vung's claims of discrimination fail outright.

## C.  Retaliation

Finally, Vung claims she was retaliated against for challenging points assessed to her when caring for her son and for complaining that her pregnancy was used against her.  Under Iowa law, it is an "unfair or discriminatory practice" for "[a]ny person to discriminate or retaliate against another person in any of the rights protected against discrimination by [the ICRA]."  Iowa Code § 216.11(2).  An employee alleging workplace retaliation must show: (1) she was engaged in a protected activity; (2) she suffered an adverse employment action; and (3) a causal connection between the two.  *City*

of Hampton v. Iowa Civil Rights Comm'n, 554 N.W.2d 532, 535 (Iowa 1996); Hulme v. Barrett, 480 N.W.2d 40, 42 (Iowa 1992).  To succeed on a claim of retaliatory discharge, Vung must show her exercise of rights under the ICRA was "a motivating factor" in Defendants' decision to terminate her employment at Swift Pork.  Haskenhoff v. Homeland Energy Sols., LLC, 897 N.W.2d 553, 602 (Iowa 2017) (plurality op.) (Cady, C.J., concurring in part and dissenting in part); id. at 635 (Appel, J., concurring in part and dissenting in part).[13]  A motivating factor "must only have 'played a part' and 'need not have been the only reason.'"  Id. at 602 (citation omitted).  Disputed facts preclude summary judgment in favor of Defendants.

Defendants briefly argue Vung is unable to prove she engaged in any protected activity in connection with her termination, but contesting discipline for an unlawful application of a no-fault attendance policy is certainly a protected activity.  An employee engages in protected conduct when she opposes any unlawful employment practice.  See Gustafson, 320 F. Supp. 3d at 1051 ("A plaintiff is not required to use any magic words to alert her employer she is opposing an unlawful employment practice.  The complaint needs to only provide enough facts to raise an inference that she was complaining of an unlawful employment practice." (citations omitted)).  Here, the disputed facts surrounding the nature and timing of Vung's communications with Swift Pork human resources personnel regarding her son's serious health condition again come to bear.  The facts support an inference that, in communicating the reason for her absences, Vung protested disciplinary action under the attendance policy on the basis of these protected absences.  Although her points

---

[13] In Haskenhoff, a plurality of the Iowa Supreme Court agreed the standard of causation for retaliatory discharge under § 216.11(2) is the same for discrimination claims brought under § 216.6(1)(a), departing from prior caselaw that followed a "significant factor" standard.  See 897 N.W.2d at 634–35 (adopting a "unified approach" to status-based and retaliation causation).

were reduced on two such occasions following her January 5 and June 29 meetings, Vung nevertheless incurred attendance points that a jury could find Defendants knew to be protected.

Defendants again argue Vung would have been terminated anyway for accruing more attendance points than permitted by Swift Pork's attendance policy.  But as described above, the record contains contested issues of fact regarding whether Defendants had sufficient notice of these conditions that bear on the entire chain of events, placing into question the ultimate cause for her termination.  Like her FMLA and discrimination claims, Vung's retaliation claim presents issues that are complicated by disputed questions of fact that cannot be decided by the Court as a matter of law.

## IV. CONCLUSION

In sum, disputed issues of fact preclude judgment as a matter of law in favor of Defendants on Plaintiff's claims for FMLA interference and discrimination, race, national origin, sex, and associational disability discrimination, and retaliation.  Accordingly, Defendants' Motion for Summary Judgment is DENIED.

IT IS SO ORDERED.

Dated this 28th day of October, 2019.

_____
STEPHANIE M. ROSE, JUDGE
UNITED STATES DISTRICT COURT